NO. 07-09-0064-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



JANUARY 12, 2010


______________________________



GUSTAVO MENDOZA GALLARDO, 



 Appellant


v.



THE STATE OF TEXAS, 



 Appellee

_________________________________



FROM THE 64TH DISTRICT COURT OF HALE COUNTY;



NO. A17752-0808; HON. ROBERT W. KINKAID, JR., PRESIDING


_______________________________



Memorandum Opinion


______________________________



Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

 Gustavo Mendoza Gallardo (appellant) appeals his felony conviction for driving while
intoxicated (DWI). His sole issue involves the sufficiency of the evidence establishing guilt. 
That is, he contends that the State failed to prove one of the prior DWI convictions it
alleged for purposes of enhancement. It so failed to prove the conviction, according to
appellant, because the copy of the judgment manifesting the conviction was unsigned. 
This argument was expressly considered and rejected in Mulder v. State, 707 S.W.2d 908
(Tex. Crim. App. 1986). There, the court held that the validity of a conviction was not
affected by the failure of the trial judge to sign the judgment. Id. Thus, the unsigned
judgment was sufficient evidence to prove the existence of a prior conviction. Id.; accord,
Flores v. State, 139 S.W.3d 61, 65 (Tex. App.-Texarkana 2004, pet. ref'd) (considering
and rejecting the same argument). 

 Accordingly, we overrule the issue and affirm the judgment of the trial court.


 Brian Quinn

 Chief Justice


Do not publish. 

 

 



air prejudice. Although a motion in\
limine normally preserves nothing for appellate review, Gonzales v. State, 685 S.W.2d 47, 50 (Tex.Crim.App.\
1985), during trial, defense counsel did “reurge” his motion in limine in response to the objectionable\
testimony. In the interest of justice, we conclude any arguments based on Rule 403 were preserved for\
review. See Tex. R. App. P. 33.1(a).
\
'

var WPFootnote9 = '
The Court disagreed with Judge Johnson’s concurring opinion that because an opening statement\
is not evidence, it is never within the trial court’s discretion to admit extraneous offense evidence to rebut a\
defensive theory raised in an opening statement. Powell, 63 S.W.3d at 439-40.
\
'

var WPFootnote10 = '
When the defense chooses to make an opening statement immediately after the State’s opening\
statement, the State may reasonably rely on this defensive opening statement as to what evidence the\
defense intends to present and rebut the anticipated defensive evidence during its case-in-chief as opposed\
to waiting until rebuttal. Bass, 270 S.W.3d at 563 n.7.
\
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}







                                                      NO. 07-08-0434-CR
NO. 07-08-0435-CR
NO. 07-08-0436-CR
NO. 07-08-0437-CR
NO. 07-08-0438-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

OCTOBER 29, 2009

______________________________


JOE MARVIN SLUTZ, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_________________________________

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NOS. 58,571-E, 58,572-E, 58,573-E, 58,574-E, & 58,575-E; 
HONORABLE DAVID GLEASON, JUDGE




_______________________________

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.
MEMORANDUM OPINION
          Following pleas of not guilty, Appellant, Joe Marvin Slutz, was convicted by a jury
of six separate offenses and assessed the corresponding punishments: (1) Cause No.
58,571-E, sexual assault of a child–twenty years confinement; (2) Cause No. 58,572-E,
Count I–aggravated sexual assault of a child–confinement for life; Count II–aggravated
sexual assault of a child–confinement for life; (3) Cause No. 58,573-E, aggravated sexual
assault of a child–confinement for life; (4) Cause No. 58,574-E, aggravated sexual assault
of a child–confinement for life; and (5) Cause No. 58,575-E, aggravated sexual assault of
a child–confinement for life. The trial court ordered the life sentences in Count I and Count
II of Cause No. 58,572-E to run concurrently; the twenty year sentence in Cause No.
58,571-E to run consecutive to the sentence in 58,572-E; the life sentence in Cause No.
58,573-E to run consecutive to the sentence in 58,571-E; the life sentence in Cause No.
58,574-E to run consecutive to the sentence in 58,573-E; and the life sentence in Cause
No. 58,575-E to run consecutive to the sentence in 58,574-E.
Factual Background
          In 2005, Appellant became acquainted with the victim, Jonathan, and his mother,
Tara, when Jonathan was 12 years old. Jonathan had lived most of his life without a
father-figure and Appellant sought to fill that role. He helped Jonathan’s mother by giving
Jonathan rides to school and doing other favors. He was added as an emergency contact
at Jonathan’s school and he allowed Jonathan to use a spare bedroom in his house from
time to time. Jonathan also did odd jobs for Appellant in exchange for gifts. 
          During the Christmas season in 2006, Appellant and Jonathan went to a Christmas
tree lot operated by Troop 80 of the Boy Scouts of America. Jonathan expressed to
Appellant an interest in joining the scouts program and, in January 2007, they pursued the
idea with Douglas Walker, the Troop 80 committee chairperson. Jonathan immediately
joined and Appellant joined the next month as an assistant scoutmaster. According to
Walker, Appellant gave the impression that he was Jonathan’s stepfather and never
indicated otherwise. 
          One of the first scouting events Appellant and Jonathan attended was swim night
at an indoor pool. Appellant changed clothes in the boys locker room. After Appellant was
informed that there was a separate locker room for adults, he nevertheless disrobed,
walked around naked, and showered in the boys locker room. According to the testimony
of several witnesses, the boys felt that Appellant was observing them as they showered.
          Over the course of the next few months, some of the scouts and adult volunteers
observed behavior by Appellant toward other scouts, which although not illegal, did violate
troop policy.


 Although the evidence showed that Appellant did not receive a policy or
procedure manual, the application he signed to join as an assistant scout master contained
information regarding the Boy Scouts of America youth protection policy. Walker also
spoke to Appellant about the youth protection policy after Appellant would not leave the
boys’ tent during a camping trip. At a scouting event in the summer of 2007, a teenage
scout patrol leader observed Appellant pull another teenage scout onto his lap and rub his
chest. The patrol leader reported the conduct to a scoutmaster. Other adult volunteers
also observed the incident and became alarmed. Thereafter, steps were immediately
taken to remove Appellant as an assistant scoutmaster, and he was instructed not to
contact any scouts. According to scoutmaster James Spencer, Appellant reacted to his
expulsion lightly, laughed, and informed Spencer that a scout named Christian would have
to come by his house and “pick up his stuff.”



          Jonathan eventually left the scout program. He was not a model student and he
suffered from behavioral problems in middle school. According to Glenda Utsey, the
liaison officer for Jonathan’s school cluster, he engaged in fighting, had poor attendance,
and frequent office referrals. He was not, however, a major offender.
          In early September of 2007, after Appellant had been expelled from Troop 80,
Jonathan’s mother called Spencer to report that Jonathan was upset, crying, and would not
talk to her. She asked him to speak with Jonathan. Accompanied by another
representative of Troop 80, Spencer went to Jonathan’s house one evening to speak with
him. Jonathan had invited a close friend of his, Robert, to be there that evening.


 
According to Spencer, Jonathan was nervous, anxious, upset, and very embarrassed, but
eventually confided in him that Appellant had sexually abused him. They talked until 1:30
the next morning. 
          Jonathan revealed to Spencer that he and Appellant had engaged in oral sex,
Appellant had anally raped him, and Appellant had watched him while he showered. 
Jonathan also claimed that Appellant threatened to hurt him if he told anyone about the
abuse.


 Spencer recommended to Jonathan’s mother that she get him some professional
help in the form of counseling. According to Spencer, Jonathan’s mother sought financial
assistance from the State for counseling but was unsuccessful due to “political stuff.” He
then recommended an attorney she should consult who might be able to help. 
          After speaking with Jonathan, Spencer contacted Detective Jeff Higley of the
Amarillo Police Department. He was assigned to investigate the case on September 5,
2007. To gather evidence, Detective Higley arranged for a single party consent call to be
made by Jonathan to Appellant.


 Guided by Detective Higley, Jonathan had the following
telephone conversation with Appellant:
[Jonathan]:I’m kind of scared.

 
[Appellant]: Why?

 
[Jonathan]: I told Robert about you touching and sucking my dick, and he
told my mom. She wants me to go take . . . talk to . . take me up to talk to
the cops.



          [Appellant]: Figures.

 
[Jonathan]:What should I tell them.



* * *

 
[Jonathan]:What will happen to you if I tell them what you did?



* * *

[Jonathan]: I don’t know . . . . Did you do that to Robert, too?

 
[Appellant]: I think so . . . once. But, that’s between Robert and me. Course,
now it’s between you and me. I don’t know. Maybe I should go to prison and
die. That would be a good thing.

 
[Jonathan]: Why’d you do that to me?

 
[Appellant]: Why did you do it to me?

 
[Jonathan]: I never did it to you.

 
[Appellant]: laughs OK . . . alright. I don’t know. Suppose I . . . I suppose
you could, uh, change the time frame, that it happened while I was, uh, you
know, having back surgery and under. Cause a lot of people came to visit
me, and I don’t remember anybody. I remember you and [A]. I don’t
remember any of the rest . . . . You could just deny it, it’s up to you. . . . 



* * *

 
[Jonathan]: What would happen to you if I told them?

 
[Appellant]: I don’t know. Lose my business, go to prison. . . . 

 
[Jonathan]:Have you done it to anybody else?

 
[Appellant]: No.



          [Jonathan]: Just me and Robert.

 
[Appellant]: Yeah. And I don’t know why I did that since then either. Maybe
cause it’s been so long since I had [my wife]. Been two years now.





The transcript was read to the jury during Detective Higley’s testimony. 
          On September 10, 2007, Appellant was asked to come to the police station for an
interview. When Detective Higley confronted him with the recorded phone call, he laughed. 
He gave a written statement in which he claimed to be nothing more than a “fill-in Dad,”
and denied having any sexual contact with Jonathan. 
          On September 21, 2007, Jonathan’s mother filed a civil lawsuit against Appellant
on Jonathan’s behalf. She alleged that Appellant coerced Jonathan into an “inappropriate
homosexual relationship” and sought actual and punitive damages for various complaints
including, but not limited to, sexual offenses and intentional infliction of emotional distress.
          A year after the civil suit was filed, Appellant gave his deposition on September 17,
2008.


 During the criminal trial, the State sought to have Exhibits 2 and 3, both excerpts
from Appellant’s civil deposition, introduced into evidence. Based on an extraneous
offense contained in the deposition, defense counsel strenuously lodged relevance
objections and objections pursuant to Rule 404(b) of the Texas Rules of Evidence.


 The
trial court admitted both exhibits and the excerpts were read to the jury.
          As the excerpts were read, the jury heard denials from Appellant regarding any
inappropriate conduct with Jonathan. In fact, Appellant accused Jonathan of
inappropriately touching him. When questioned whether he had ever had sexual contact
with other males, Appellant answered, “I would say yes, but that’s really none of anybody’s
business but mine.” Appellant then alluded to sexual experimentation being something all
males do. The deposition continued:
Q.Have you ever had homosexual sex with another male?

 
A. No, sir.

 
Q.Okay. And by that, I would include oral sex, anal sex –

 
A.Oh, well, oral – oral, yes.

 
          Q.       Okay, Have you ever had oral sex with – as an adult with a child?

 
A.No, sir. Oh, well, other than with [Robert], and that’s none of your
business either, but – 

 
Q.Who’s [Robert]?

 
          A.       That’s a friend of [Jonathan’s].

 
          Q.       Okay. So you had oral sex with [Robert]?

 
          A.       Uh-huh.



* * *

 
          Q.       When was this that you had oral sex with Robert?

 
          A.       Right after I had back surgery.

 
          Q.       And when was that?

 
          A.       I think it was in May of 2007.

 
          Q.       How old was [Robert] at the time?

 
          A.       Fourteen. 



Appellant again denied any inappropriate sexual conduct with Jonathan.
          Before Jonathan was called to testify during the criminal trial, the State called Robert
to the stand. Defense counsel reurged his motion in limine objections (Rule 404(b) and
Rule 403), and the trial court instructed the parties to approach before violating the motion
in limine. The State expressed its intent to question Robert about what he told Spencer
the night Spencer visited Jonathan’s house.
          During his testimony, Robert claimed he did not disclose specifics to Spencer about
Appellant’s conduct and just told him that “stuff that had gone on” because he did not know
Spencer and felt uncomfortable telling him things. He did, however, testify that he told
Spencer Appellant would make him take his clothes off and shower while he washed his
clothes. Oftentimes, the laundry was not done until the next day and he would sit around
Appellant’s house naked. Some times Appellant was also naked. 
          Jonathan testified after Robert. According to Jonathan, his relationship with
Appellant became “weird” in 2006. Appellant began “touching, feeling, taking off his shirt
and sitting me on his lap.” The two began engaging in oral sex and according to Jonathan,
about a month later, Appellant’s conduct escalated to anal rape. Jonathan testified that
the threats made by Appellant began after the anal assaults started. Jonathan also
described an incident while he was in the shower in which Appellant got in with him and
washed him and touched his private parts.
          The final witness to testify for the State was Becky O’Neal, the SANE examiner. 
According to her testimony, Jonathan was extremely uncomfortable with the exam and had
poor eye contact throughout. Jonathan reported that the abuse began in sixth grade and
continued through eighth grade. He claimed to have been anally raped 75 times. O’Neal
did not find any evidence of trauma to Jonathan’s body; however, the exam showed that
Jonathan had suffered multiple penetration of the anus which wore down the area and
healed in the form of a scar. She concluded that Jonathan’s story was consistent with the
results of her exam. 
          After the State rested, the defense offered its only exhibit in the form of Plaintiff’s
Original Petition in the civil suit filed by Jonathan’s mother. No other evidence was offered
and the defense rested.Analysis
          By a sole issue, Appellant contends the trial court abused its discretion in admitting
extraneous evidence of him assaulting another child. Specifically, Appellant’s complaints
are directed at the trial court’s admission of Appellant’s deposition excerpts (State’s
Exhibits 2 and 3) and the testimony of Robert. These errors, he maintains, caused him
harm due to the severity of his cumulative sentences. We disagree.
          I.        Standard of Review–Admissibility of Evidence
          We review a trial court’s ruling admitting evidence for abuse of discretion. Casey
v. State, 215 S.W.3d 870, 879 (Tex. 2007) (citing Montgomery v. State, 810 S.W.2d 372,
391 (Tex.Crim.App. 1990) (op. on reh’g)). A trial court abuses its discretion when its
decision is outside the zone of reasonable disagreement. Green v. State, 934 S.W.2d 92,
102 (Tex.Crim.App. 1996). Otherwise we are required to uphold a trial court’s admissibility
decision. Montgomery, 810 S.W.2d at 391.
 

          II.       Extraneous Offense Evidence
          Rule 404(b) of the Texas Rules of Evidence provides that extraneous offense
evidence is not admissible to prove the character of a person in order to show action in
conformity therewith. Tex. R. Evid. 404(b). However, it is not rendered inadmissible if the
extraneous offense evidence is relevant to a fact of consequence apart from its tendency
to show conduct in conformity with character. Johnston v. State, 145 S.W.3d 215, 221-22
(Tex.Crim.App. 2004). 
          Rule 403 provides in part that relevant evidence may be excluded if its probative
value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. 
Relevant evidence is generally admissible. Tex. R. Evid. 402. In keeping with the
presumption of admissibility of relevant evidence, trial courts should favor admission in
close cases. Casey, 215 S.W.3d at 879. 
          For extraneous offense evidence to be admissible under both Rule 404(b) and Rule
403, that evidence must satisfy the following two-prong test:
∙Is the extraneous offense evidence relevant to a fact of consequence
in the case apart from its tendency to prove conduct in conformity with
character?
∙Is the probative value of the evidence sufficiently strong so that it is
not substantially outweighed by unfair prejudice?
 
See Johnston, 145 S.W.3d at 220. 
          “Probative value” refers to the inherent probative force of an item of evidence–that
is, how strongly it serves to make more or less probable the existence of a fact of
consequence to the litigation–coupled with the proponent’s need for that evidence. 
Gigliobianco v. State, 210 S.W.3d 637, 641 (Tex.Crim.App. 2006). “Unfair prejudice” refers
to a tendency to suggest decision on an improper basis, commonly, though not
necessarily, an emotional one. Id. Only unfair prejudice provides the basis for exclusion
of relevant evidence. Montgomery, 810 S.W.2d at 389.
          In our review, we presume that probative value substantially outweighs the danger
of unfair prejudice. Id. Thus, the defendant bears the burden to demonstrate that the
danger of unfair prejudice substantially outweighs the probative value of evidence. Poole
v. State, 974 S.W.2d 892, 897 (Tex.App.–Austin 1998, pet. ref’d). In reviewing a trial
court’s Rule 403 ruling, we are to reverse the judgment “rarely and only after a clear abuse
of discretion.” Mozon v. State, 991 S.W.2d 841, 847 (Tex.Crim.App. 1999).
                     A.       Rule 404(b)
          In support of offering excerpts of Appellant’s deposition and the testimony of Robert,
the State relied on Powell v. State, 63 S.W.3d 435 (Tex.Crim.App. 2001). In Powell, the
Court reversed the appellate court’s decision reversing the trial court for abusing its
discretion in admitting extraneous offense evidence. Id. at 436. At trial, the defense
presented its theory during its opening statement that the defendant could not have
molested the child victim because of the presence of his daughters and others who slept
in the living room. Id. at 436-37. This theory was also advanced during cross-examination
of the victim. The victim testified that she was never alone with the defendant. During its
case-in-chief, the State contravened the defensive theory with four witnesses who testified
that the defendant had molested them under almost identical circumstances as the
charged offense. Id. at 437.
          The defense presented testimony from dozens of girls who spent the night at the
defendant’s house without anyone being molested. Id. The State then rebutted that
evidence with two additional witnesses who testified similar to the four who had already
testified during the State’s case-in-chief. Id. On appeal, the defendant argued the trial
court erroneously admitted the testimony of the State’s six witnesses because their
testimony was admitted solely for the purpose of character conformity, to-wit: the
defendant is a child molester. Id. 
          The relevant inquiry under the facts of Powell was whether the evidence was
admissible for its non-character conformity purpose. Id. at 439. Such evidence was
admissible to rebut a defensive theory which gave the evidence relevance apart from
character conformity. Id. The Powell Court added that the trial court’s limiting instruction
clearly showed the evidence was admitted for its non-character conformity purpose. Id.



          Some years after Powell, the Court decided in Bass v. State, 270 S.W.3d 557, 563
(Tex.Crim.App. 2008), that case law supports a decision that a defense opening statement
may open the door to the admission of extraneous offense evidence to rebut the defensive
theory presented in the defense opening statement.


 In Bass, defense counsel alleged
in his opening statement that the victim’s allegations of molestation were “pure fantasy”
and “pure fabrication.” Id. at 557. Defense counsel continued that the allegations were
contrary to the defendant’s character because he was a pastor and minister; “he is the real
deal and the genuine article.” Id. at 558. During its case-in-chief, the State was permitted
to present extraneous offense evidence of other girls who had been molested in the
defendant’s church office. Id. at 558-59.
          Bass complained on direct appeal that the extraneous offense evidence was
inadmissible under Rule 404(b) because it was offered solely for the purpose of character
conformity. Id. at 562. The appellate court held the trial court abused its discretion in
admitting the evidence to rebut a “fabrication” defense even though the evidence would
have been admissible to rebut a “frame-up” or “retaliation” defense. Bass v. State, 222
S.W.3d 571, 575-78 (Tex.App.–Houston [14th Dist.] 2007). Finding no categorical
distinctions between “fabrication” defenses and “frame-up” or “retaliation” defenses, the
Court of Criminal Appeals concluded the trial court did not abuse its discretion in admitting
the extraneous offense evidence to rebut the defensive theory of fabrication and reversed
the appellate court. Bass, 270 S.W.3d at 563.
          In the instant case, the defense made its opening statement immediately after the
State’s opening statement. Defense counsel recalled the movie “Wall Street” and quoted
the main character saying, “greed is good, greed is the American way.“ Counsel continued
with his defensive theory that Jonathan’s allegations against Appellant were motivated by
money. Counsel then mentioned the civil lawsuit for monetary damages to which the State
objected as being improper opening argument. The trial court overruled the State’s
objection and defense counsel continued to talk about the civil lawsuit. “The evidence is
going to show in this case that shortly after the Boy Scouts said [Appellant] get out, that an
opening was seen, a chance to get money was seen.” Counsel then suggested that
Jonathan’s allegations worsened as the civil lawsuit progressed. In his closing argument,
defense counsel reiterated the theory that the civil lawsuit for damages was the motive
behind the allegations Jonathan made against Appellant.
          The defense waved the lawsuit in the face of the jury during opening argument, yet
vehemently objected during trial when the State offered excerpts from Appellant’s civil
deposition. Under Bass, the defense opening statement opened the door to admission of
extraneous offense evidence. 270 S.W.3d at 558. The defense was theorizing that
Jonathan fabricated the allegations against Appellant. By offering the excerpts from
Appellant’s deposition in which he admitted to performing sexual acts with Robert, and by
offering Robert’s testimony that “stuff had gone on” with Appellant, the State was
attempting to show that Appellant’s claim of fabrication-for-money defense was less
probable. By showing that the allegations were less likely to be fabricated, the extraneous
offense evidence directly rebutted Appellant’s defensive theory and had logical relevance
apart from character conformity. Id. at 562-63.
          Additionally, the trial court gave the jury the following limiting instruction in all five
charges: 
[Appellant] is on trial solely on the charge contained in the indictment. In
reference to evidence, if any, that [Appellant] has previously participated in
recent transactions or acts, other than that which is charged in the indictment
in this case, you are instructed that you can not consider such other
transactions or acts, if any, for any purpose unless you find and believe
beyond a reasonable doubt that [Appellant] participated in such transactions
or committed such acts, if any; and even then you may only consider the
same for the purpose of determining intent or knowledge or motive or
opportunity or preparation or plan or identity or absence of mistake or
accident, if it does, and for no other purpose.
 
          Appellant relies on Daggett v. State, 187 S.W.3d 444 (Tex.Crim.App. 2005), in
which the Court found error in the admission of extraneous offense evidence which was
similar to the charged offense and reversed the case and remanded it for a harm analysis. 
Daggett, however, involved the “plan” exception to the admission of extraneous offense
evidence and not evidence to rebut a defensive theory. Additionally, the court’s limiting
instruction in Daggett, when considered with the State’s closing argument, improperly
permitted the jury to consider the challenged evidence for its substantive value. We
choose to apply Bass, a more recent pronouncement from the Court of Criminal Appeals,
which permits the admission of extraneous offense evidence to rebut the defensive theory
of fabrication. 270 S.W.3d at 562-63.
          We conclude that the extraneous offense evidence had relevance apart from
character conformity. Thus, we must now evaluate the evidence under Rule 403 to see
if its probative value outweighed its prejudicial effect. 
          B.       Rule 403
          While evidence may be admissible under Rule 404(b), the trial court may exercise
its discretion to exclude the evidence if its probative value is substantially outweighed by
the danger of unfair prejudice. Moses v. State, 105 S.W.3d 622, 626 (Tex.Crim.App.
2003). The trial court must balance (1) the inherent probative force of the proffered item
of evidence along with (2) the proponent’s need for that evidence against (3) any tendency
of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence
to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be
given undue weight by a jury that has not been equipped to evaluate the probative force
of the evidence, and (6) the likelihood that presentation of the evidence will consume an
inordinate amount of time or repeat evidence already admitted. See Casey, 215 S.W.3d
at 879.
          Based on a review of the entire record, we find the deposition excerpts and Robert’s
testimony were strongly probative to rebut the defensive theory that Jonathan fabricated
the allegations. Thus, as proponent of the evidence, the State established a need for the
evidence. Although the evidence could have had a tendency to suggest conviction on an
improper basis, the trial court properly instructed the jury on the limited purpose for which
the extraneous offense evidence was admitted. The evidence was not the sort that would
have caused confusion or distraction of the main issue. Finally, Robert’s testimony was
very brief compared to that of eight other witnesses, and the reading of the two deposition
excerpts which amounted to approximately sixteen pages of text from a record containing
multiple volumes and hundreds of pages did not consume an inordinate amount of time. 
Viewing the totality of the factors, we conclude the trial court did not abuse its discretion
in admitting the challenged extraneous offense evidence. Appellant’s sole issue is
overruled.
                                                            Conclusion
          The trial court did not abuse its discretion in admitting State’s Exhibits 2 and 3 and
the testimony of Robert to rebut Appellant’s defensive theory that Jonathan had fabricated
the allegations against him for financial gain from a civil lawsuit. 
          Consequently, the trial court’s judgments are affirmed. 


                                                                           Patrick A. Pirtle

                                                                                 Justice





Do not publish.